553 So.2d 153 (1989)
Raymond Michael THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
No. 69352.
Supreme Court of Florida.
October 19, 1989.
Rehearing Denied December 28, 1989.
*154 Jane D. Fishman, Plantation, for appellant.
Robert A. Butterworth, Atty. Gen., and Deborah Guller, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Raymond Michael Thompson appeals his conviction and sentence of death for the first-degree murder of Jimmy Savoy. Pursuant to article V, section 3(b)(1) of the Florida Constitution, we have jurisdiction.
Savoy, an old friend and associate of Thompson's, allegedly stole approximately *155 $600,000 from Thompson and fled from South Florida to Massachusetts. According to witnesses, Thompson put out an "open contract" on the life of Jimmy Savoy. Bobby Davis, another of Thompson's associates, testified pursuant to a plea agreement that in March 1982, Davis, Thompson, and two other associates located Savoy in South Florida and kidnapped him. They then took Savoy out to sea on Thompson's boat and tortured him by beating. Afterwards Savoy was wrapped in chains, shot by Thompson in the back of the head, and dumped overboard.
Following conviction for first-degree murder, the jury recommended that Thompson be sentenced to life imprisonment. The trial judge found there was no reasonable basis for this recommendation and overrode it, sentencing Thompson to death. The court found the following aggravating circumstances:
1. Thompson had been convicted of a prior violent felony (a 1950 rape conviction in Illinois);
2. The murder was committed while engaged in an enumerated felony (kidnapping);
3. The murder was committed for pecuniary gain;
4. The murder was especially heinous, atrocious, or cruel; and
5. The murder was cold, calculated, and premeditated.
The court found no mitigating circumstances, rejecting evidence and expert testimony that Thompson's capacity to conform his conduct to the requirements of law was substantially impaired. The court also rejected other evidence in mitigation.
Thompson raises four issues concerning the guilt phase of the trial and two additional issues regarding his sentencing. Only one of the guilt phase issues merits discussion.[1] Thompson argues that the state failed to disclose exculpatory material pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The material in question is an affidavit sworn to by the state's star witness, Bobby Davis, that contained statements which contradicted his trial testimony. Thus the material could have been used, if disclosed, to impeach the credibility of a central state witness. The United States Supreme Court held in United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), that if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed, then failure to disclose the evidence is reversible error. The subject of the contradictory statements involves Thompson's role in the actual kidnapping of Savoy and the amount of money Savoy was accused of stealing. For the reasons which follow, we believe the failure to disclose this affidavit while error was harmless and thus did not constitute reversible error.
The standard by which constitutional error is determined is materiality, and the undisclosed information must be viewed "in the context of the entire record." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). The apparent contradiction in the affidavit regarding the amount of money Savoy allegedly stole is a classic example of statements which are not material. The question of whether Savoy stole $400,000 or $600,000 has no probative significance in the context of the entire record. While it is true that Davis' statement in the affidavit that Thompson was not present during the actual kidnapping does conflict with his trial testimony, we believe that, in the context of the entire record, this contradiction does not raise a reasonable probability that the result of the proceeding would have been different.
First, it should be noted that the "contradiction" is more in the form of an omission rather than an affirmative statement of fact that conflicts with another affirmative statement of fact. Davis was asked to list the people who he remembered were present at the scene of Savoy's kidnapping *156 and he failed to list Thompson's name among the other three people who were present. Moreover, Davis' statements and testimony do not conflict on the important point that the kidnapping took place at Thompson's behest and under his direction. Most importantly, there is no contradiction as to the facts of the killing.
Thus, despite the fact that the affidavit given by Davis conflicted with trial testimony, such conflict does not raise a reasonable probability that the result of the proceeding would have been different. See Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. The United States Supreme Court has defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id. We are convinced that the result in this case would have been the same. Accordingly, we affirm Thompson's conviction for first-degree murder.
Thompson raised two issues pertaining to the penalty phase of the trial. One concerns the override of the jury's recommendation of life and the other relates to the constitutionality of Florida's death penalty statute.[2]
Before turning to the override, we must address the validity of the aggravating circumstances found by the trial court. Thompson alleges error in two of the aggravating factors. Initially, Thompson argues that his 1950 conviction in Illinois for rape is too remote in time and place to be considered a valid aggravating factor. However, the statute is silent as to when or where a previous conviction for a violent felony must have taken place. § 921.141(5)(b), Fla. Stat. (1983). Therefore this aggravating circumstance is valid.
Thompson further argues that the finding of the aggravating circumstance that the crime was committed for pecuniary gain was not supported by the record. He points to the testimony of two state witnesses that Thompson stated he did not care about the money but merely wanted to "get" Savoy. There is no doubt that Thompson's conduct was motivated in part by revenge. However, it is clear that the purpose of the beatings inflicted in the boat was to prevail upon Savoy to divulge where the money was located. As Thompson told Savoy, "you can die easy or you can die hard." The evidence supports the conclusion that the crime was committed for pecuniary gain.
We now turn to the trial court's override of the jury's recommendation of life imprisonment. An override may be sustained only when there is no reasonable basis upon which the jury could have based its recommendation. Tedder v. State, 322 So.2d 908 (Fla. 1975). Thompson argues that the evidence demonstrated that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. In addressing this statutory mitigating circumstance in the sentencing order, the trial judge stated:
This mitigating circumstance does not apply. Dr. Arthur Stillman, a psychiatrist, was paid by Raymond Thompson to examine Raymond Thompson for the purpose of testifying in this cause. Dr. Stillman spoke to Raymond Thompson for approximately one hour and twenty minutes in the Broward County Jail on June 12th, 1986, which was seven (7) days after his convictions in this cause.
Dr. Stillman spoke to the defendant's lawyers and a Dr. Kelly, who is a heart specialist. Dr. Stillman did not review the court file, police reports, statements by witnesses, tapes of Raymond Thompson that were introduced into evidence, nor did he discuss Mr. Thompson's mental status with any of his family, his friends, business associates or anyone else who knew the defendant at the time that the murder took place in 1982.
Dr. Stillman's medical opinion is that the defendant is now suffering from organic *157 brain damage and that this condition existed at the time of the murder and kidnapping.
Dr. Stillman made his findings based upon answers to his questions given by the defendant and further by observing the defendant's body language, facial grimaces, lack of expression and certain reactions or lack of reactions, both verbal and non-verbal.
The defendant was asked to give his meaning of a proverb "people who live in glass houses should not throw stones." The defendant told Dr. Stillman what he felt the saying meant and when asked if he had any additional interpretation of the saying, Mr. Thompson stated "don't talk out of school." The defendant could not elaborate on that answer and appeared frustrated to Dr. Stillman.
Mr. Thompson could not remember Dr. Stillman's name even though the doctor's name is written on one lens of his eyeglasses. Dr. Stillman testified that the reason he has his name on the lens of his glasses is so that his patients will know who they are talking to.
The Doctor testified that there are other tests which he gave Mr. Thompson, which further shows his lack of ability to remember, which is an indication of organic brain syndrome.
Some of the other testing Dr. Stillman relied upon related to Mr. Thompson's inability to concentrate on long term problems. As an example, he asked Mr. Thompson to state the names of the Presidents of the United States. Thompson was requested to start backwards from Ronald Reagan. Dr. Stillman indicated that Mr. Thompson had problems. He started with Carter and could only go back to Eisenhower. During cross examination Dr. Stillman was asked if he would name the presidents backwards from Ronald Reagan. Dr. Stillman tried to comply and in doing so, he failed by leaving out Presidents Johnson and Truman on route to President Hoover.
Dr. Stillman first indicated that the history he received from Mr. Thompson had no bearing upon his opinion. He indicated that even though Mr. Thompson may have had an interest in how he answered his questions and even if all the answers were false that in his opinion the defendant had organic brain damage in March of 1982. Dr. Stillman stated that he works backwards, in that after he determines that there is brain damage from his questioning and observance of the patient, he can then go back and determine how many years it would have necessarily taken to develop this current degree of brain damage. Dr. Stillman indicates that in this case, it would have taken at least five years of drug and alcohol abuse to develop the severity of the brain damage which Mr. Thompson currently has. Dr. Stillman does indicate, however, that this finding could be wrong if the defendant had a head injury, such as if he were dropped on his head when he was a child. The Doctor later contradicts his earlier testimony and states that his opinion is based on the answers Mr. Thompson gave to his questions and the small evidences of memory defects, date defects, stress defects, judgment defects, abstract reasoning defects, discriminative reasoning defects and low frustration tolerance. All of these things put together spell out damage which had to have taken more than five years to occur, so says Dr. Stillman.
During the trial Bobby Stephens, Bobby Davis and many other witnesses testified that the defendant had over fifty people working for him. That the defendant was always in complete control of everyone and able to operate his business which is now known to be a multi-million dollar drug smuggling enterprise. In addition the defendant's own family testified that he was not suffering from any such mental or emotional disturbance. All the facts and evidence point to a contrary conclusion given by Dr. Stillman and this court finds that no reasonable juror could have found that this mitigating circumstance could have applied based upon the evidence presented.
The evidence supports the trial court's reasoned analysis that this statutory mitigating factor did not exist.
*158 Thompson also argues that the jury may have recommended life imprisonment because the others involved in the murder received lesser sentences or were granted immunity in exchange for their testimony. Jury recommendations against the death penalty which may have been based on a desire to provide equality in sentencing were considered in Eutzy v. State, 458 So.2d 755, 759 (Fla. 1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985), in which it was said:
This Court has upheld the reasonableness of jury recommendations of life which could have been based, to some degree, on the treatment accorded one equally culpable of the murder. McCampbell v. State, 421 So.2d 1072 (Fla. 1982). In such cases, we have reversed the judge's decision to override the recommendation when the accomplice was a principal in the first degree; Herzog v. State, 439 So.2d 1372 (Fla. 1983); McCampbell v. State; when the accomplice was the actual triggerman; Barfield v. State, 402 So.2d 377 (Fla. 1981); Slater v. State, 316 So.2d 539 (Fla. 1975); when the evidence was equivocal as to whether defendant or the accomplice committed the actual murder; Smith v. State, 403 So.2d 933 (Fla. 1981); Malloy v. State, 382 So.2d 1190 (Fla. 1979); Halliwell v. State, 323 So.2d 557 (Fla. 1975); or when the accomplice was the controlling force instigating the murder; Stokes v. State, 403 So.2d 377 (Fla. 1981); Neary v. State, 384 So.2d 881 (Fla. 1980). In every case, the jury has had before it, in either the guilt or the sentencing phase, direct evidence of the accomplice's equal culpability for the murder itself. That is not the case before us.
As in Eutzy, the evidence in this case provides no basis upon which the jury could have recommended life imprisonment in order to prevent disparity in sentencing. The record reflects that Thompson was in charge and his accomplices were subordinates. Thompson ordered that Savoy be apprehended, and it was Thompson, rather than his accomplices, who inflicted the fatal shot.
The remaining evidence submitted in mitigation did not provide a reasoned basis for a jury recommendation of life imprisonment. In the final analysis, this was a contract killing conducted in a professional manner by an underworld crime boss. With five valid aggravating circumstances, no statutory mitigating circumstances, and very little nonstatutory mitigating evidence, the trial judge's override was legally sound.
We affirm both the conviction for first-degree murder and the sentence of death.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW and GRIMES, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion, in which BARKETT, J., concurs.
KOGAN, Justice, concurring in part, dissenting in part.
Although I concur with the majority in affirming Thompson's conviction, I cannot agree that the override of the jury recommendation of life imprisonment was proper. As the majority notes, the correct standard to be applied when considering a life sentence recommendation is whether there exists a reasonable basis for that recommendation. Tedder v. State, 322 So.2d 908 (Fla. 1975). Because I believe such a basis did exist in this case, I must dissent from the majority's affirmation of the jury override.
The majority opinion draws at length from the trial court's findings of fact supporting the death penalty. That order examines the credibility of the psychiatrist who testified that Thompson's capacity to conform his conduct to the requirements of law was substantially impaired. The trial judge details all the reasons why the jury should not have believed the psychiatrist and states that the jury recommendation of life was unreasonable because the psychiatrist lacked credibility.
The flaw in this reasoning is the mistaken premise that it is the judge's role to assess credibility. Although the judge issues *159 "findings of fact" when he or she imposes the death penalty, the jury is still the primary finder of fact. Thus, it is beyond question that it is within the province of the jury to assess the credibility of witnesses and determine from that point whether the death penalty is appropriate. If the jury believes the evidence of Thompson's impaired capacity, then the trial court, as well as this Court, is bound by that finding. The fact that the trial judge does not believe the witness is utterly irrelevant.
A judge may only override a life sentence recommendation where there is no basis in the record for that recommendation. Here, there is competent and substantial evidence that Thompson's capacity to conform his conduct to the requirements of law was substantially impaired. Thus the jury's recommendation of life must be upheld. Because it was not, I must respectfully dissent.
BARKETT, J., concurs.
NOTES
[1] We find no merit in the issues Thompson raises regarding double jeopardy, the lack of jurisdiction over acts allegedly committed on the high seas, or the admission of evidence of prior bad acts.
[2] The issue of whether Florida's death penalty statute is constitutional has been resolved by this Court as well as the United States Supreme Court. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, reh'g denied, 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976); State v. Dixon, 283 So.2d 1, 11 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).